IN THE UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

| | | |
|---|---|---|
| ALICIA LONEY, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Case No. 07-1452-KI |
| | ) | |
| vs. | ) | OPINION AND ORDER |
| | ) | |
| MICHAEL ASTRUE, Commissioner | ) | |
| Social Security Administration, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

Merrill Schneider
Schneider Law Offices
P. O. Box 16310
Portland, Oregon  97292-0310

Attorney for Plaintiff

Karin J. Immergut
United States Attorney
District of Oregon
Britannia I. Hobbs
Assistant United States Attorney
1000 SW Third Avenue, Suite 600
Portland, Oregon  97204-2902

Page 1 - OPINION AND ORDER

David Morado
Regional Chief Counsel
David M. Blume
Special Assistant United States Attorney
Social Security Administration
Office of the General Counsel
701 5th Avenue, Suite 2900 M/S 901
Seattle, Washington  98104-7075

      Attorneys for Defendant

KING, Judge:

Plaintiff Alicia Loney brings this action pursuant to section 205(g) of the Social Security Act, as amended, 42 U.S.C. § 405(g), to obtain judicial review of a final decision of the Commissioner denying plaintiff's application for disability insurance benefits ("DIB").  I affirm the decision of the Commissioner.

## BACKGROUND

Loney filed an application for DIB on January 9, 2004, claiming disability since November 15, 2001.  The applications were denied initially and upon reconsideration.  After a timely request for a hearing, Loney, represented by counsel, appeared and testified before an Administrative Law Judge ("ALJ") on December 6, 2006.

On January 4, 2007, the ALJ issued a decision finding that Loney was not disabled within the meaning of the Act and therefore not entitled to benefits.  This decision became the final decision of the Commissioner when the Appeals Council declined to review the decision of the ALJ on July 26, 2007.

## DISABILITY ANALYSIS

The Social Security Act (the "Act") provides for payment of disability insurance benefits to people who have contributed to the Social Security program and who suffer from a physical or mental disability. 42 U.S.C. § 423(a)(1). In addition, under the Act, supplemental security income benefits may be available to individuals who are age 65 or over, blind, or disabled, but who do not have insured status under the Act. 42 U.S.C. § 1382(a).

The claimant must demonstrate an inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to cause death or to last for a continuous period of at least twelve months. 42 U.S.C. §§ 423(d)(1)(A) and 1382c(a)(3)(A). An individual will be determined to be disabled only if his physical or mental impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. 42 U.S.C. §§ 423(d)(2)(A) and 1382c(a)(3)(B).

The Commissioner has established a five-step sequential evaluation process for determining if a person is eligible for either DIB or SSI due to disability. The claimant has the burden of proof on the first four steps. Parra v. Astrue, 481 F.3d 742, 746 (9th Cir. 2007), cert. denied, 128 S. Ct. 1068 (2008); 20 C.F.R. §§ 404.1520 and 416.920. First, the Commissioner determines whether the claimant is engaged in "substantial gainful activity." If the claimant is engaged in such activity, disability benefits are denied. Otherwise, the Commissioner proceeds to step two and determines whether the claimant has a medically severe impairment or combination of impairments. A severe impairment is one "which significantly limits [the

claimant's] physical or mental ability to do basic work activities." 20 C.F.R. §§ 404.1520(c) and 416.920(c). If the claimant does not have a severe impairment or combination of impairments, disability benefits are denied.

If the impairment is severe, the Commissioner proceeds to the third step to determine whether the impairment is equivalent to one of a number of listed impairments that the Commissioner acknowledges are so severe as to preclude substantial gainful activity. 20 C.F.R. §§ 404.1520(d) and 416.920(d). If the impairment meets or equals one of the listed impairments, the claimant is conclusively presumed to be disabled. If the impairment is not one that is presumed to be disabling, the Commissioner proceeds to the fourth step to determine whether the impairment prevents the claimant from performing work which the claimant performed in the past. If the claimant is able to perform work which he or she performed in the past, a finding of "not disabled" is made and disability benefits are denied. 20 C.F.R. §§ 404.1520(e) and 416.920(e).

If the claimant is unable to perform work performed in the past, the Commissioner proceeds to the fifth and final step to determine if the claimant can perform other work in the national economy in light of his or her age, education, and work experience. The burden shifts to the Commissioner to show what gainful work activities are within the claimant's capabilities. Parra, 481 F.3d at 746. The claimant is entitled to disability benefits only if he is not able to perform other work. 20 C.F.R. §§ 404.1520(f) and 416.920(f).

## STANDARD OF REVIEW

The court must affirm a denial of benefits if the denial is supported by substantial evidence and is based on correct legal standards. Bayliss v. Barnhart, 427 F.3d 1211, 1214 n.1

(9th Cir. 2005). Substantial evidence is more than a "mere scintilla" of the evidence but less than a preponderance. Id. "[T]he commissioner's findings are upheld if supported by inferences reasonably drawn from the record, and if evidence exists to support more than one rational interpretation, we must defer to the Commissioner's decision." Batson v. Barnhart, 359 F.3d 1190, 1193 (9th Cir. 2003) (internal citations omitted).

## THE ALJ'S DECISION

The ALJ concluded that plaintiff has bipolar affective disorder and a history of polysubstance dependence as severe impairments. However, the ALJ did not find that these impairments met or medically equaled the requirements of any of the impairments listed in Appendix 1, Subpart P of the Social Security Regulations. The ALJ opined that plaintiff has the residual functional capacity ("RFC") to understand, remember, and carry out simple instructions, and she is limited to occasional contact with the general public and co-workers. After obtaining testimony from a vocational expert ("VE"), the ALJ determined that someone with this RFC could perform work as an electronics assembler, addresser, and laundry folder.

## FACTS

Plaintiff was 29 years old at the time of her alleged onset date. She graduated from high school and took some college classes. She worked as a customer service representative, assistant manager, stocker, video store cashier and salesperson, fast-food worker, and bartender. She last worked in 2002.

Plaintiff has bipolar disorder, with manic and depressive episodes. She says she has had symptoms since she was six years old. Plaintiff has been hospitalized three times for suicidal

ideation.  In the past, she has been medicated with Depakote, Lithium, Celexa, Klonopin,

Risperdal, Lamictal, Valium, Geodon, and Lexapro.

Plaintiff was first hospitalized in November 2002, at Adventist Medical Center, with

diagnoses of chemical dependence, rule out bipolar disorder, and mixed personality disorder with

borderline features.  She was assigned a global assessment of functioning ("GAF") score of 30 to

40.[1]  She reported having thoughts about killing herself, her husband and her father-in-law.  She

was "pleasant, cooperative, oriented times three.  Speech was goal directed.  No grandiosity or

delusions were noted.  She denied suicidal ideation or homicidal ideation, intent, or plan[.]"  Tr.

162.  Robert Barriatua, MD, opined, "Based on the patient's clinical presentation I believe that

there is a high likelihood that these statements are purely for dramatic effect and not sincere.

However, because of the potential seriousness of the threats I elected to not call the patient's

bluff and possibly endanger her relatives' lives."  Tr. 160.  She was admitted for psychiatric

evaluation.

About two weeks before this hospitalization, plaintiff was followed at Clackamas County

Mental Health after she took an overdose of Tylenol and, a few days later, cut her wrists

superficially.

--------

[1] A GAF score of between 21 and 30 demonstrates "[b]ehavior is considerably influenced by delusions or hallucinations OR serious impairment in communications or judgment (e.g., sometimes incoherent, acts grossly inappropriately, suicidal preoccupation) OR inability to function in almost all areas (e.g., stays in bed all day; no job, home, or friends)."  A GAF score of between 31 and 40 demonstrates "[s]ome impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) OR major impairment in several areas, such as work or school, family relations (e.g. depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school)."  The American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 34 (4th ed. 2000) ("DSM-IV").

Plaintiff stopped taking her medication in February 2003 when she learned she was pregnant. She reported she does not stay depressed for very long–only about 20 minutes.

In November 2003, a therapist assigned a GAF of 50.[2] The therapist noted that plaintiff's husband was out of work, that plaintiff had a baby a month before, that plaintiff was having symptoms of irritability, anger, depression, and some suicidal ideation with no plan or intent. Plaintiff experienced interrupted sleep with the new baby. She was not taking any medications because she was breast feeding.

A month later, Slater Tai, M.D., with Western Psychological and Counseling Services, evaluated plaintiff and assigned a GAF of 45. He noted she stopped taking Depakote, Klonopin and Celexa when she learned she was pregnant, and continued to abstain from her medications while breast feeding. She wanted to restart her medications. She described irritability, anger, some depression, increased anxiety, but denied suicidal ideation. Dr. Tai assessed her GAF at 48 in January 2004, a GAF of 50 in February 2004, and a GAF of 46 in March 2004.

Plaintiff was voluntarily admitted to Providence St. Vincent Medical Center for auditory hallucinations and suicidal ideation in April 2004. Plaintiff described conflicts between her husband and a new roommate. The admitting physician reported plaintiff was not "attending to auditory hallucinations and she is somewhat vague as to what the voices say to her[.]" Tr. 245. A psychiatrist assigned a score of 40, with a note that the highest score was 85[3] in the last year.

---

[2] A GAF of between 41 and 50 demonstrates "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." DSM-IV at 34.

[3] A score of between 81 and 90 demonstrates "[a]bsent or minimal symptoms (e.g., mild anxiety before an exam), good functioning in all areas, interested and involved in a wide range of activities, socially effective, generally satisfied with life, no more than everyday problems or concerns (e.g., an occasional argument with family members)." DSM-IV at 34.

Plaintiff showed no "overt psychotic symptoms such as rapid speech, inappropriate affect, paranoia or agitation." Tr. 242. She was discharged three days later with a GAF of 75.[4]

At the recommendation of her outpatient provider, plaintiff voluntarily referred herself to the Partial Hospital Program at the end of July 2004 through Providence St. Vincent Medical Center. She described suicide ideation. She participated in group psychotherapy. Michael Domash, M.D., evaluated plaintiff at the beginning of August and concluded that although she claimed to be in a manic episode, she displayed "no objective signs of mania whatsoever." Tr. 389. She also described depression, but "feels completely safe and has no plans on hurting herself." Id. Dr. Domash was "skeptical" about the diagnosis of bipolar disorder. He found her mental status to be completely normal. He assigned a GAF of 60.[5]

On August 5, 2004, plaintiff left group treatment without telling anyone where she was going. On her way home, she unintentionally drove her car into the bushes next to the highway. She was transported to the emergency room and was cleared to go home. Her husband brought her into the emergency room the next day when she continued to appear disoriented. She claimed the car accident was due to taking too much medication.

She saw Dr. Domash again on August 17, 2004 and reported auditory and visual hallucinations, including voices telling her to hurt herself. Dr. Domash reported that plaintiff was "quite bright and cheerful," that she was joking with him frequently, and that no delusions

---

[4] A score of between 71 and 80 demonstrates "[i]f symptoms are present, they are transient and expectable reactions to psycho-social stressors (e.g., difficulty concentrating after family argument); no more than slight impairment in social, occupational, or school functioning (e.g., temporarily falling behind in schoolwork)." DSM-IV at 34.

[5] A score of between 51 and 60 demonstrates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." DSM-IV at 34.

are apparent.  Tr. 356.  Dr. Domash noted that plaintiff reported feelings of anxiety and panic,

"though she appears perfectly at ease in the interview setting."  Id.  Furthermore, he reported that

she describes suicidal ideation but "insists that she feels safe, particularly since she now has her

mother there 16-hours-a-day looking after her son."  Id.  Dr. Domash remained skeptical of the

diagnosis, and thought her symptoms were closer to borderline personality disorder.  He assessed

her GAF to be 45.

Plaintiff was voluntarily admitted to Providence St. Vincent Medical Center again in

December 2004 for suicidal ideation.  The admitting physician noted her mood was one of a

"somewhat flat affect, but she is reasonably engaging and insightful, with normal speech and

appropriate interaction."  Tr. 327.  She had stopped taking her medications for the past two

months because she wanted to get pregnant.  Her GAF on admission was 30.

There are no medical records from 2005.

Plaintiff had her second baby in March 2006, and reported that she had been off

medications since June 2005.  In September 2006, plaintiff sought services at LifeWorks.  She

reported a raging mood, but "her affect was quite calm," and the social worker described

plaintiff's presentation as "incongruous" with her stated mood.  Tr. 432.

Plaintiff was evaluated by Judy DeNunzio, PMHNP, on November 3, 2006.  Nurse

DeNunzio diagnosed plaintiff with bipolar disorder, post-traumatic stress disorder, and assessed

her GAF as 45.  Nurse DeNunzio noted specifically that plaintiff reported no side effects from

her medications of Lithium, Risperdal, Trazodone, Clonazepam, and Lexapro.

Plaintiff has used methamphetamine twice, uses marijuana occasionally, and drinks

alcohol occasionally.

## DISCUSSION

I.    <u>GAF Scores</u>

Plaintiff argues that the ALJ erred in failing to mention and address the GAF scores given by various treating physicians.  The Commissioner contends that GAF scores are completely irrelevant and the ALJ did not err in discussing only a handful of them.  <u>See</u> 65 Fed. Reg. 50,746-01, 50,764-65 (Aug. 21, 2000) (GAF "does not have a direct correlation to the severity requirements in our mental disorder listings."); <u>Koenig v. Astrue</u>, No. CIV-S-06-2033-KJM, 2008 WL 850032, at *3 (E.D. Cal. Mar. 28, 2008) ("The GAF does not correlate to the severity assessments utilized in Social Security disability determinations.").

The GAF is a tool for a clinician to report his or her judgment of an individual's level of functioning with respect to psychological, social and occupational functioning.  DSM-IV at 34.  A GAF score considers two components: the severity of one's symptoms and the ability of one to function.  <u>Id.</u>

The ALJ reported the GAF score given at the time plaintiff was admitted to Adventist Medical Center and concluded that the GAF of 30 to 40 was not consistent with the mental status examination.  The ALJ also noted Dr. Domash's August 2004 GAF assessments of 60 and 45.  The ALJ found the score of 45 to be based on plaintiff's subjective symptoms, as opposed to a mental status evaluation.

The ALJ failed to note the scores assigned by Dr. Tai during his treatment of plaintiff from November 2003 through March 2004, which ranged from 45 to 50.  The ALJ also neglected to discuss plaintiff's GAF of 40 upon admission to Providence St. Vincent Medical Center in April 2004.  Similarly, the ALJ failed to note plaintiff's GAF of 30 upon her voluntary admission to Providence St. Vincent Medical Center in December 2004.  Finally, although the ALJ

indicated he would keep the record open until January 2007, he did not mention records plaintiff

submitted on December 29, 2006.  Among those records included Nurse DeNunzio's assessment

of plaintiff's GAF at 45.  These last records were considered by the Appeals Council.

Although the GAF score is a helpful means of evaluating a patient's condition, the ALJ

need not discuss all of the GAF scores.  The GAF scores are simply a way to sum up a clinician's

overall estimation as to the psychological, social and occupational functioning of a patient.  If the

ALJ properly summarized and evaluated the medical evidence, he need not note each GAF score

given by a medical provider.  The ALJ discussed Dr. Tai's report from December 2003, when

plaintiff was reporting irritability, anger, depression and anxiety.  He also includes a discussion

of Dr. Tai's progress notes at Western Psychological Counseling Services from November 2003

to April 2004, and reported that they generally referred to plaintiff's history.  The ALJ described

plaintiff's admissions to the hospital in April and December 2004, and described her suicidal

ideation, auditory hallucinations, and psychosis at those times.  Since the ALJ adequately

described plaintiff's medical history, including multiple hospitalizations for suicidal ideation and

auditory hallucinations, the ALJ was not required to report all of the GAF scores.  See Vincent v.

Heckler, 739 F.2d 1393, 1394-95 (9th Cir. 1984) (ALJ need not discuss all evidence, just

"significant probative evidence").

Furthermore, any omission was harmless because even if the scores were credited, they

would not establish disability.  First, a GAF of 45 is not automatically supportive of a finding of

disability.  See Morgan v. Commissioner of Soc. Sec. Admin., 169 F.3d 595, 598 (9th Cir. 1999)

(court upheld ALJ's decision that plaintiff was capable of working, despite depression,

personality disorder and a GAF as low as 45/55 and 49).  Second, each evaluator noted

situational stressors, such as plaintiff's husband's unemployment, the new baby and attendant

Page 11 - OPINION AND ORDER

lack of sleep, and plaintiff's decision to stop taking her medications, making the GAF scores not relevant to plaintiff's functional capacity.

As for the GAF scores that the ALJ disregarded, the ALJ may properly discount medical opinions that are unsupported by objective evidence. Upon admission to Adventist, the doctor who scored plaintiff between 30 and 40 did not describe any of the factors that would support such a GAF score. The doctor noted no delusions, hallucinations, an inability to communicate, and did not describe any social circumstances such as plaintiff's avoiding friends or her inability to work. Instead, the doctor specifically noted plaintiff was not delusional, had fair insight, judgment and impulse control, was cooperative and oriented. Similarly, Dr. Domash's GAF score of 45 was based primarily on plaintiff's report of "intense suicide ideation," and conflicted with his observation of her as "bright and cheerful" and joking with him. Tr. 356. An ALJ is not required to accept the opinion of a physician, even a treating physician, if the opinion is "brief, conclusory, and inadequately supported by clinical findings." Batson v. Barnhart, 359 F.3d 1190, 1195 (9th Cir. 2003).

The ALJ did not err in failing to note all of the GAF scores where he adequately discussed the medical record, and did not err in rejecting some of the GAF scores.

II.    Plaintiff's Credibility

Plaintiff disputes the ALJ's credibility finding, arguing that the fact that plaintiff was not compliant with treatment and that her statements were not substantiated by objective medical evidence are not sufficient reasons to reject her testimony.

Plaintiff claims her bipolar disorder interferes with her ability to work due to anger, and cycles of depressive and manic phases. Her medications make her feel like a "zombie" and she stops taking them, but when she stops taking her medications she experiences symptoms.

When deciding whether to accept the subjective symptom testimony of a claimant, the ALJ must perform a two-stage analysis.  In the first stage, the claimant must produce objective medical evidence of one or more impairments which could reasonably be expected to produce some degree of symptom.  Lingenfelter v. Astrue, 504 F.3d 1028, 1036 (9th Cir. 2007).  The claimant is not required to show that the impairment could reasonably be expected to cause the severity of the symptom, but only to show that it could reasonably have caused some degree of the symptom.  In the second stage of the analysis, the ALJ must assess the credibility of the claimant's testimony regarding the severity of the symptoms.  If there is no affirmative evidence of malingering, the ALJ may reject the claimant's testimony "only by offering specific, clear and convincing reasons for doing so."  Id.

The ALJ found that plaintiff's testimony "concerning the intensity, persistence and limiting effects" of her symptoms was not entirely credible.  Tr. 21.  He noted her providers repeatedly described plaintiff as intelligent, with good physical health, friendly, talkative, someone who likes to help others, pleasant, cooperative and oriented.  Plaintiff alleged symptoms at six years old, but was able to graduate from high school, get some college, and did not seek treatment until 2002.

The ALJ also referred to plaintiff's tendency to self-medicate with alcohol and marijuana, even during pregnancy, and her significant other's remark to a provider that he and plaintiff had done a lot of "partying this weekend."  Tr. 244.  Drugs and alcohol are contraindicated for the medications she takes.  The ALJ noted that plaintiff stopped medications without consulting her providers because of pregnancy or a desire to get pregnant due to concern about birth defects, but used marijuana during her pregnancy and may have used methamphetamine once during her pregnancy.  Plaintiff was told she could take Geodon during pregnancy, but she was off

Page 13 - OPINION AND ORDER

medications during her second pregnancy. The ALJ noted plaintiff's failure to contact her providers as promised, her failure to show for appointments, and leaving group sessions without informing staff. The ALJ also concluded that although plaintiff describes herself as a paperweight in a corner on her medications, the record shows her condition can be controlled with medication compliance. Her failure to comply, and her use of drugs and alcohol while on medications, "preclude her to claim any side-effects from medications." Tr. 24.

Plaintiff asserts that "claimants are notorious for harboring the mistaken belief that the medical treatment prescribed is not necessary or that it is not the best way to address their impairments," so the ALJ erred in holding plaintiff's noncompliance against her. Pl.'s Opening Br. at 8. Plaintiff may be correct as a general matter, but there is nothing in the record to support that this was plaintiff's reason for ceasing her medications. Plaintiff also cites Nguyen v. Chater, 100 F.3d 1462 (9th Cir. 1996), arguing that an ALJ may not consider the failure to seek treatment for a mental illness as a basis to question a claimant's credibility. Here, however, we are not talking about plaintiff's failure to seek treatment, but rather her failure to follow a prescribed course of treatment. This is an adequate reason to find a claimant not fully credible. See Smolen v. Chater, 80 F.3d 1273, 1284 (9th Cir. 1996) (citations omitted) (ALJ may rely on inadequately explained failure to follow treatment).

Furthermore, although the ALJ cannot reject subjective pain testimony solely because it was not fully corroborated by objective medical evidence, medical evidence is still a relevant factor in determining the severity of the pain and its disabling effects. Rollins v. Massanari, 261 F.3d 853, 857 (9th Cir. 2001). Plaintiff's providers repeatedly described plaintiff's behavior as conflicting with her reported feelings. This was not the sole reason for finding plaintiff's testimony not fully credible.

Page 14 - OPINION AND ORDER

As for plaintiff's assertions about the side effects of her medication, the ALJ concluded that the "evidence shows significant problems with adherence to treatment, which have caused some deterioration in symptoms, but still her mental health condition briefly responds to treatment and is expected to stabilize with continued compliance." Tr. 24. Plaintiff does not dispute this statement and does not point to contrary evidence in the record. Furthermore, evidence reviewed by the Appeals Council reflects that plaintiff told her provider she was not having any side effects from her medications.

The ALJ's credibility findings and interpretation of the record are supported by substantial evidence with regard to plaintiff's testimony about her impairments and her inability to work.

III.     <u>Lay Witness Testimony</u>

Plaintiff argues the ALJ did not properly reject Laura Lowe's testimony about the side effects plaintiff experienced while on medication.

Lowe testified that when plaintiff is on her medications she is like a zombie, tired, grumpy, dramatic, chaotic and hard to be around. Plaintiff and Lowe had been roommates for a month, and Lowe assisted plaintiff with her children.

The ALJ did not give significant weight to Lowe's testimony. The two had only known each other a short time, plaintiff had just started her medications three weeks previously, and Lowe lived at plaintiff's house rent free in exchange for watching plaintiff's children, suggesting Lowe may have an interest in the outcome of the proceeding. In addition, the ALJ gave as a reason for rejecting Lowe's testimony that Lowe "merely refers to either her observations of the claimant's behavior, or the claimant's repetitions of her complaints."

Page 15 - OPINION AND ORDER

Lay testimony about a claimant's symptoms is competent evidence which the ALJ must take into account unless he gives reasons for the rejection that are germane to each witness.  A medical diagnosis, however, is beyond the competence of lay witnesses.  Nguyen v. Chater, 100 F.3d 1462, 1467 (9th Cir. 1996).  A legitimate reason to discount lay testimony is that it conflicts with medical evidence.  Lewis v. Apfel, 236 F.3d 503, 511 (9th Cir. 2001).

As a threshold matter, plaintiff is correct that the ALJ's rejection of Lowe's testimony on the basis that it is based on Lowe's observations is not a specific and legitimate reason to reject Lowe's testimony.  Friends and family members and others in a position to observe a claimant's symptoms and daily activities are competent to testify as to the claimant's condition.  Dodrill v. Shalala, 12 F3d  915, 918 (9th Cir 1993).  Nevertheless, the ALJ gave other reasons that are sufficient and are based on the record, such as the short amount of time Lowe knew plaintiff, the short amount of time plaintiff had been taking medications, and the fact that Lowe may have had a reason for supporting plaintiff's claim of disability.

In sum, the ALJ gave germane reasons for rejecting the lay witness testimony.

## CONCLUSION

The findings of the Commissioner are based upon substantial evidence in the record and the correct legal standards, and therefore the court affirms the decision of the Commissioner.

IT IS SO ORDERED.

Dated this _____18th_____ day of November, 2008.


    /s/ Garr M. King                          
Garr M. King
United States District Judge